UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| OV LOOP, INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * Civil Action No. 1:24-cv-10412-IT |
| MASTERCARD INCORPORATED and | * |
| MASTERCARD INTERNATIONAL | * |
| INCORPORATED, | * |
| | * |
| Defendants. | * |

MEMORANDUM & ORDER

May 7, 2025

TALWANI, D.J.

Before the court is Defendants Mastercard Inc. and Mastercard International Inc.'s (collectively "Mastercard") Motion to Dismiss [Doc. No. 54] Plaintiff OV Loop, Inc.'s ("OV Loop") Amended Complaint for Violations of the Sherman Antitrust Act [Doc. No. 48]. OV Loop asserts claims under 15 U.S.C. § 2 ("the Sherman Act") based on Mastercard's alleged withholding of access to a service that would enable OV Loop to offer processing for payments made with Mastercard-branded credit and debit cards on OV Loop's mobile wallet platform. For the reasons set forth below, Mastercard's Motion to Dismiss [Doc. No. 54] is granted.

I. **Factual Background as Alleged in the Amended Complaint**

The Amended Complaint alleges the following:

OV Loop provides a "unified commerce platform with a universal wallet, mall, and messenger application for buyers and omnichannel payments." Am. Compl. ¶ 38 [Doc. No. 48]. OV Loop's mobile wallet platform works on virtually any smartphone and allows users to tap and pay at most point-of-sale terminals in the United States. Id. ¶ 96. OV Loop's digital platform

1

"provides users with multiple payment rail options to use when making purchases, including Mastercard's payment processing network." Id. ¶ 38. Payment rails are the infrastructure that facilitate the transfer of funds between parties and make it possible to process payments, including credit and debit card payments. Id. ¶ 42.

Mastercard is one of two leading payment card networks in the United States. Id. ¶ 27. As of 2022, 37.5% of credit cards in circulation worldwide were Mastercard cards, and Mastercard's market share was 27.41% as measured by card network purchase volume. Id. ¶ 128. The number of Mastercard cards held by consumers is higher than all other card providers except Visa. Id. ¶ 127. Together, Mastercard and Visa currently control approximately 80% of the market. Id. ¶ 27. Mastercard's payment card network allows merchants to route card transactions from their point-of-sale devices to the bank receiving the payment. Id. ¶ 30.

In accordance with card network standards, mobile wallets must communicate with retailers using technology known as "tokenization." Id. ¶ 57. Tokenization transforms sensitive and static information, like a user's name and account number, into a token that is only used once for a single transaction. Id. ¶ 30. When a credit or debit card holder loads the card into a mobile wallet, the card is "tokenized," which means that the account number printed on the card is replaced with a different number—i.e. the "token"—to protect the original account number during the stages of a transaction. Id. ¶ 31. When a cardholder initiates a transaction using a mobile wallet, the merchant receives the token rather than the original account number. Id. The merchant then sends this token and a unique cryptogram to an acquirer, which sends the token to a network for processing. Id.

Mastercard operates as a Token Service Provider that generates payment tokens for Mastercard-branded cards for use in digital payment transactions, including tokens used by

mobile wallet applications. Id. ¶ 30. Mastercard's tokenization system is known as Mastercard Digital Enablement Service, or "MDES." See id. ¶ 73.[1]

Mastercard controls access to tokens generated by MDES regardless of the owner of the mobile wallet. Id. ¶ 32. Only companies approved by Mastercard can request and receive Mastercard MDES tokens for a mobile wallet. Id. Mastercard promulgates specifications that mobile wallets that use Mastercard-branded cards must meet. Id. ¶ 72. Therefore, a third party cannot offer a wallet that can host a consumer's Mastercard cards without Mastercard's approval to connect to its MDES tokens. Id. ¶ 73. In other words, if a mobile wallet provider wants its platform to work with a bank's Mastercard-branded card, it must have access to the tokens that Mastercard generates for the bank. Id. ¶ 63. Mastercard allows companies including Apple, Google, Samsung, LG, and Garmin to use its MDES token services for their mobile payment services. Id. ¶ 36. Mastercard receives an interchange fee from each tokenized mobile wallet payment. Id. ¶ 33. Mastercard also charges issuers and acquirers a separate "digital enablement fee" for its mobile wallet tokenization services. Id. ¶ 64.

In late 2018, OV Loop, through its CEO, approached Mastercard to obtain certification to enable Mastercard-branded cards on OV Loop's mobile wallet platform. Id. ¶ 99. Since 2018, OV Loop has had dozens of meetings and calls with Mastercard designed to secure Mastercard's approval of OV Loop's mobile wallet platform. Id. ¶ 108. For example, in February 2020, OV Loop's CEO met with a Mastercard representative, and the two discussed integration of OV Loop's mobile wallet platform with Mastercard's MDES tokenization system. Id. ¶ 101. In April

---

[1] Visa has its own tokenization and security process, known as VTS. Am. Compl. ¶ 161 [Doc. No. 48]. In July of 2019, OV Loop and Visa Signed a Visa Digital Enablement Program Master Agreement, which has provided OV Loop a path to VTS certification. Id. ¶¶ 163–62.

2021, OV Loop's CEO reached out to the same representative to explain OV Loop's platform and ask whether she would help get OV Loop's MDES integration and certification fast-tracked. Id. ¶ 102.

During its attempts to get certified to use Mastercard tokens, OV Loop completed Mastercard paperwork, provided Mastercard with requested documents, and answered Mastercard's questions. Id. ¶ 109. Mastercard had expressed that it was excited about OV Loop and looked forward to working together, and it never outright denied OV Loop approval. Id. ¶ 110. OV Loop was sending Mastercard requested information as recently as 2022. Id. ¶ 111. However, despite years of discussions, demonstrations, and presentations, OV Loop has not received access to Mastercard's token service or its MDES development and testing environment. Id. ¶ 112. In contrast, Samsung Pay received access and certification for MDES within about six months. Id. In 2022, OV Loop came to realize that Mastercard was in effect refusing to certify OV Loop for MDES. Id.

## II. Standard of Review

In evaluating a motion to dismiss for failure to state a claim, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. at 555 (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### III. Discussion

The Amended Complaint [Doc. No. 48] asserts claims under Section 2 of the Sherman Act for: unlawful monopolization through refusal to deal (Claim I), id. at ¶¶ 208–19, through a denial of access to an essential facility (Claim III), id. at ¶¶ 227–37, and through maintenance of a monopoly (Claim V), id. at ¶¶ 243–67; and unlawful attempt to monopolize by refusal to deal (Claim II), id. at ¶¶ 220–26, denial of access to an essential facility (Claim IV), id. at ¶¶ 238–42, and anticompetitive conduct (Claim VI), id. at ¶¶ 268–73.

#### A. *Unlawful Monopolization*

Section 2 of the Sherman Act makes it unlawful to "monopolize . . . any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2. To establish unlawful monopolization, the plaintiff must demonstrate: (1) that the defendant possessed monopoly power in the relevant market, and (2) that the defendant acquired or maintained monopoly power by "improper means." Vázquez-Ramos v. Triple-S Salud, Inc., 55 F.4th 286, 300 (1st Cir. 2022) (quoting Town of Concord v. Bos. Edison Co., 915 F.2d 17, 21 (1st Cir. 1990)).

Because a Section 2 claim requires that the defendant exercises a threshold level of market power, such claims typically require defining a relevant market and showing that the defendant has a dominant share of that market. See Diaz Aviation Corp. v. Airport Aviation Servs., Inc., 716 F.3d 256, 265 (1st Cir. 2013); see also Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 197 (1st Cir. 1996) ("Without a definition of the relevant market, it is impossible to determine market share.") (quoting Rebel Oil Co. v. Atl.

5

Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995)). Consequently, at the pleading stage, the plaintiff must allege "facts that plausibly delineate a relevant market." Vázquez-Ramos, 55 F.4th at 297. The relevant market is the area of effective competition and includes both a relevant product and geographic market. See id. at 296. The geographic market is the area in which the seller operates and in which the purchaser can "practicably turn for supplies." See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961).

"Determining the scope of a product market begins with examining the universe of products that are considered 'reasonably interchangeable by consumers for the same purposes.'" Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 854 (1st Cir. 2016) (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956)). "At the pleading stage, a plaintiff plausibly must allege that the products in the defined market are not reasonably interchangeable for products outside the defined market, and that consumers are not likely to substitute other products if the given product becomes more expensive." Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc., 483 F. Supp. 3d 38, 56 (D. Mass. 2020). "Once a plaintiff plausibly alleges a market, the determination whether the defined market is correct is a question of fact not suitable for dismissal under Rule 12(b)(6)." Id.

    1.    Market Definition

Plaintiff asserts two relevant product markets, both with a geographic market of the United States. Am. Compl ¶¶ 114, 117, 137 [Doc. No. 48].

    a.    The First Relevant Market

OV Loop defines a First Relevant Market as "consumer-merchant mobile wallet contactless payments network processing services on behalf of banks," or "C-M Mobile Payment Services." Id. ¶ 114. Providers in this market "simultaneously facilitate, at a physical point-of-

sale through a consumer's mobile wallet: (1) a consumer's use of a financial account with a third-party to buy a merchant's goods or services; and (2) a merchant's acceptance of the consumer's payment." Id. According to OV Loop, the "principal players" in the First Relevant Market are Visa and Mastercard. Id. ¶ 131.

OV Loop alleges that Mastercard provides services in this market through their branded virtual cards for mobile wallets transacting at a physical point of sale via Mastercard's payment rails. Id. ¶ 114. OV Loop would provide services in this market through its cross-platform mobile wallet platform via alternative payment rails. Id. ¶ 115. Companies such as Apple, Google, and Samsung do not offer products or services in this market because their wallet applications host Mastercard and Visa virtual cards, and the card network provides the relevant transaction processing services. Id. ¶ 115.

OV Loop's allegations regarding the C-M Mobile Payment Services market are sufficient. Mastercard argues that OV Loop's definition of the First Relevant Market is "improperly gerrymandered" because it includes no other mobile wallets even though OV Loop admits to competing against them, and because it excludes alternative forms of payment that are interchangeable. Mem. ISO Mot. to Dismiss 16 n.6 [Doc. No. 55]. Although OV Loop's product market definition excludes several companies that it alleges offer mobile wallet applications, "'well-defined submarkets may exist' inside a broad product market and may themselves 'constitute product markets for antitrust purposes.'" Vázquez-Ramos, 55 F.4th at 297 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)). And OV Loop distinguishes competitors in the First Relevant Market, which provide payment processing services, from other mobile wallet providers, whose applications utilize the payment processing services of card providers. See Am. Compl. ¶¶ 114–15 [Doc. No. 48].

7

Whether OV Loop's distinction actually delineates the universe of reasonably interchangeable products is a question of fact that requires "inquiry into the 'commercial realities' faced by consumers." Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 482 (1992) (quoting United States v. Grinnell Corp., 384 U.S. 563, 572 (1966)). But at the pleading stage, OV Loop must only plausibly define a relevant market. See Vázquez-Ramos, 55 F.4th at 298. Where OV Loop has differentiated products in the First Relevant Market from other mobile wallet providers, it has alleged a relevant product market for the purpose of stating a Section 2 claim.

        b.        Second Relevant Market

The Amended Complaint also attempts to assert a single brand market by alleging that a mobile wallet must have access to Mastercard's tokenization system to enable payment with a Mastercard-branded card and limiting the Second Relevant Market to "payment network processing using Mastercard branded cards." See Am. Compl. ¶¶ 73, 75, 137 [Doc. No. 48]. Specifically, OV Loop defines the Second Relevant Market as "the United States market for point-of-sale universal mobile wallet payment network processing using Mastercard branded cards." Id. ¶ 137. Mastercard argues that OV Loop has not sufficiently pled a single-brand market. Mem. ISO Mot. to Dismiss 19 [Doc. No. 55].

In some instances, namely a derivative market in which a brand provides aftermarket parts and services for its own equipment, one brand can constitute a distinct market for antitrust purposes. See Eastman Kodak, 504 U.S. at 481–82. This is because aftermarket services and parts for that brand's equipment are not interchangeable with another manufacturer's services and parts. See id.

Here, however, OV Loop's Second Relevant Market—universal mobile wallet payment network processing using Mastercard branded cards—is merely a subset of the First Relevant Market—mobile wallet contactless payments network processing services on behalf of banks. This undermines any inference that payment processing services in the Second Relevant Market are not interchangeable with those in the first. OV Loop has not distinguished mobile wallet payment processing services provided by Visa or other card issuers such that they are not "reasonably interchangeable" with MDES for mobile wallet providers, particularly where OV Loop has alleged that Visa is a "principal player" in the First Relevant Market. Am. Compl. ¶ 131 [Doc. No. 48]. Consequently, OV Loop's Second Relevant Market definition fails for purposes of analyzing its Section 2 claims. See <u>Bio-Rad Lab'ys, Inc.</u>, 483 F. Supp. 3d at 56.

2. Monopoly Power

OV Loop alleges that "Mastercard possesses monopoly power in the First Relevant Market, as demonstrated by structural characteristics of the market, including barriers to entry, Mastercard's conduct, Mastercard's market share, and other direct and circumstantial evidence, including direct evidence of Mastercard's actual exercise of its monopoly power." Am. Compl. ¶ 136 [Doc. No. 48].

Mastercard asserts that a monopolization claim requires that the Defendant have a market share of at least 70%, and that OV Loop has failed to meet this threshold. Mem. ISO Mot. to Dismiss 16 [Doc. No. 55]. Mastercard also argues that OV Loop's allegation that Mastercard and Visa dominate the market together contradicts any inference that Mastercard is a monopolist. <u>Id.</u> at 17.

OV Loop has failed to allege that Mastercard has monopoly power in the First Relevant Market. "Market power is the ability to raise prices above those that would be charged in a

competitive market." Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85, 109 n.38 (1984). Monopoly power requires a heightened degree of market power. Eastman Kodak, 504 U.S. at 481. Monopoly power is "the power to control prices or exclude competition." Grinnell, 384 U.S. at 571 (quoting E.I. du Pont de Nemours & Co., 351 U.S. at 391).

Ordinarily, monopoly power may be inferred from a defendant's predominant share of the relevant market. Grinnell, 384 U.S. at 571. A plaintiff may also demonstrate market power by showing actual supracompetitive prices and restricted output. Coastal Fuels of Puerto Rico, 79 F.3d at 196.

Here, OV Loop has not alleged that Mastercard possesses a market share that indicates it has monopoly power in the First Relevant Market. OV Loop alleges that as of 2022, 37.5% of credit cards in circulation worldwide were Mastercard cards, and that Mastercard's market share as measured by card network purchase volume was 27.41%. Am. Compl. ¶ 128 [Doc. No. 48]. Assuming these figures are indicative of Mastercard's market share in the United States market for C-M Mobile Payment Services, OV Loop has not alleged that Mastercard has a predominant market share. See Grinnell, 384 U.S. at 567, 571 (concluding monopoly existed where defendant and subsidiaries controlled 87% of the market); see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 451 (4th Cir. 2011) (affirming finding that allegations of 70% market share were sufficient to plead monopoly power); Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 65 F.3d 1406, 1411 (7th Cir. 1995), as amended on denial of reh'g (Oct. 13, 1995) ("Fifty percent is below any accepted benchmark for inferring monopoly power from market share.")

Market share is evidence of monopoly power rather than monopoly power itself. See Grinnell, 384 U.S. at 571. Therefore, OV Loop's failure to allege that Mastercard has a certain share of the market is not in and of itself fatal to its assertion that Mastercard possesses monopoly power. However, as the Second Circuit has explained, "[w]hile market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power." Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 98 (2d Cir. 1998). And in the First Circuit, a 70% to 90% market share is generally "thought indicative of monopoly power." Town of Concord, Mass. v. Bos. Edison Co., 915 F.2d 17, 30 (1st Cir. 1990). Mastercard's alleged market share is much lower.

Further, OV Loop's allegations do not otherwise indicate that Mastercard has the power to control prices or exclude competition with the First Relevant Market. OV Loop asserts that Mastercard's fees within the First Relevant Market are "above what they would be" if that market were competitive and alleges that such fees have at least doubled within the last decade while Mastercard's stock price and revenue have grown. Am. Compl. ¶ 129 [Doc. No. 48]. However, OV Loop also alleges Visa, Mastercard's primary competitor in the First Relevant Market, has experienced stock price and revenue growth within the same period. Id. Additionally, OV Loop alleges that Visa, American Express, and Discover provide their own tokenization services for payment processing. See id. ¶¶ 63 n.2, 161. These allegations suggest Mastercard does not have monopoly power in the First Relevant Market. See Town of Concord, 915 F.2d at 29–30 (finding record did not show defendant had monopoly power where defendant lacked predominant market share and market included several other participants).

OV Loop contends that Mastercard has been "adjudicated to possess market power independent of Visa," citing United States v. Visa U.S.A., Inc., 344 F.3d 229 (2d Cir. 2003).

11

There, the Second Circuit affirmed a finding that both companies, "jointly and separately, have power within the market for network [processing] services." Id. at 239. However, that case involved claims under Section 1 of the Sherman Act, which require a showing of market power rather than monopoly power. See id. at 237–38. And as OV Loop concedes, monopoly power under Section 2 is "something greater" than market power under Section 1. Eastman Kodak, 504 U.S. at 481; see Opp'n 7 n.4 [Doc. No. 67]. OV Loop has pointed to no case law under Section 2 suggesting that multiple monopolists can exist within the same market.

In sum, OV Loop has failed to allege facts supporting its claim that Mastercard possesses monopoly power within the First Relevant Market. And as explained below, OV Loop has also failed to plead that Mastercard's conduct in withholding MDES access from OV Loop is anticompetitive.

      3.     Anticompetitive conduct

Even if OV Loop had alleged facts supporting its claim that Mastercard possesses monopoly power within the First Relevant Market, the possession of monopoly power is not unlawful without accompanying anticompetitive conduct. Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004). OV Loop alleges that Mastercard has engaged in anticompetitive conduct by refusing to grant OV Loop access to MDES. Specifically, OV Loop alleges this conduct constitutes an unlawful refusal to deal with OV Loop, Am. Compl. ¶ 212 [Doc. No. 48], and a denial of access to an "essential facility," id. ¶ 229.[2]

---

[2] OV Loop asserts a separate count for "Unlawful Monopoly Maintenance," but this claim is also based on Mastercard's "withholding MDES certification." Id. ¶ 247.

12

a. Refusal to Deal

Mastercard argues that OV Loop has not sufficiently alleged anticompetitive conduct based on a refusal to deal. First, Mastercard argues that OV Loop has not alleged that Mastercard has refused to grant MDES access to OV Loop; it has simply not dealt with OV Loop as quickly as OV Loop would like. Mem. ISO Mot. to Dismiss 8–9 [Doc. No. 55]. Alternatively, Mastercard argues that OV Loop has not alleged facts supporting an exception to the general rule that Mastercard has no duty to deal with competitors or potential competitors. Id. at 8.

As to the first argument, it is reasonable to infer from OV Loop's allegations that Mastercard has refused to grant OV Loop access to MDES. OV Loop has alleged that between 2018 and 2022, it worked with Mastercard to obtain certification, exchanged many communications regarding certification, and provided Mastercard with requested documentation regarding the schematics of its product and its security measures. Am. Compl. ¶¶ 108–112 [Doc. No. 48]. Despite this, Mastercard has not determined OV Loop's eligibility for MDES access or granted OV Loop access to Mastercard's MDES development and testing environment. Id. ¶ 112. OV Loop also alleges that Mastercard certified another mobile wallet provider for MDES access within about six months. Id. Although OV Loop has not pleaded an explicit denial of MDES certification, OV Loop has sufficiently alleged facts from which a jury could infer that Mastercard has refused OV Loop access to this service.

Mastercard is correct that it has a general right to "freely . . . exercise [its] own independent discretion as to parties with whom [it] will deal." Trinko, 540 U.S. at 408 (quoting United States v. Colgate & Co., 250 U.S. 300, 307 (1919)). That right is not unqualified. Id. But a refusal to deal is not anticompetitive "simply because it harms competitors." See Town of Concord, Mass., 915 F.2d at 21. Instead, a refusal to deal may constitute anticompetitive

13

behavior where the circumstances suggest an exclusionary intent. Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 602 (1985) (explaining that in an unlawful monopolization case, "evidence of intent is . . . relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive'").

In Aspen Skiing, the Supreme Court upheld a jury verdict in the plaintiff's favor on a Section 2 claim based on a refusal to deal because "the record . . . comfortably support[ed] an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival." Id. at 610. There, the defendant owned and operated three out of four ski resorts in the Aspen area. See id. at 589–90. The plaintiff owned the fourth. See id. For several years, the defendant and the plaintiff had cooperated to issue a joint, multi-day lift ticket that provided skiers access to all four resorts. Id. at 590. The defendant eventually demanded an increased revenue share, and later ended its participation in the four-mountain ticket program. Id. at 591–93. The plaintiff pursued various avenues to recreate the four-mountain ticket, including attempting to purchase the defendant's tickets at retail price, but the defendant rejected each attempt. See id. at 593–94.

The defendant's decision to terminate its participation in an existing business arrangement supported the conclusion that its behavior was anticompetitive because the defendant "did not merely reject a novel offer to participate in a cooperative venture that had been proposed by a competitor. Rather, the [defendant] elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years." Id. at 603. Based on this behavior, the Court determined that "[t]he jury may well have concluded that [the defendant] elected to forgo . . . short-run benefits because it was more interested in reducing competition . . . by harming its smaller competitor." 472 U.S. at 608.

Later, in Trinko, the Court explained that Section 2 liability in Aspen Skiing was proper because the defendant's conduct "revealed a distinctly anticompetitive bent," but that Aspen Skiing "is at or near the outer boundary of § 2 liability." 540 U.S. at 409.

In contrast, the Trinko defendant's conduct was not anticompetitive. Unlike in Aspen Skiing, the complaint in Trinko did not allege that the defendant had ceased a voluntarily course of dealing with its rivals. See id. at 409. Further, while the defendant's refusal in Aspen Skiing to sell plaintiff tickets at its own retail price indicated an anticompetitive motive, the Trinko defendant's refusal to provide services at a cost-based rate did not indicate the defendant's intent to pursue or maintain monopoly power. Id. Here, as in Trinko, OV Loop has not alleged that Mastercard has terminated an existing course of dealing or has engaged in any other conduct that revealed a distinctly anticompetitive bent. OV Loop alleges only that it approached Mastercard seeking approval for MDES and was refused. See Am. Compl. ¶¶ 99, 112 [Doc. No. 48].

OV Loop relies on Steward Health Care System, LLC v. Blue Cross & Blue Shield of Rhode Island, 311 F. Supp. 3d 468 (D.R.I. 2018) to argue that Section 2 claims based on a refusal to deal does not require a particular fact pattern. Opp'n 13 [Doc. No. 67]. True, but they do require more than just a refusal. In Steward Health Care System, the defendant did not terminate an existing course of dealing directly with the plaintiff, but it did end a "presumably profitable" course of dealing with the plaintiff's acquisition target to keep the plaintiff out of the relevant geographic market, which revealed a "distinctly anticompetitive bent." Id. at 485–86.

In contrast, OV Loop has not alleged conduct that suggests Mastercard's denial of access to MDES is exclusionary. OV Loop asserts that its use of MDES would provide Mastercard additional profit, and that Mastercard is forgoing this profit in refusing OV Loop MDES access. Am. Compl. ¶ 155 [Doc. No. 48]. But this allegation effectively alleges that Mastercard refused

15

an offer from a potential customer. A finding that such an allegation is sufficient on its own to support a Section 2 claim would negate the general rule that a private business may exercise its own independent discretion in choosing parties with which to deal. See Trinko, 540 U.S. at 408; see also id. 407–08 (explaining that "[c]ompelling . . . firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities").

Further, unlike in Aspen Skiing, Mastercard's refusal to grant OV Loop MDES access does not change conditions that originated in a competitive market. See 472 U.S. at 603. In Aspen Skiing, the relevant market included only the plaintiff and the defendant, but here OV Loop alleges that the First Relevant Market includes other competitors, including at least one "principal player" besides Mastercard. See Am. Compl. ¶¶ 127, 131 [Doc. No. 48]. And OV Loop itself has not yet entered the First Relevant Market. See id. ¶ 95 (alleging OV Loop is a "market-ready" company). Denying OV Loop MDES access does not alter the existing market structure. The alleged circumstances thus do not give rise to a plausible inference that Mastercard withheld access to MDES for the purpose of acquiring or maintaining monopoly power.

        b.      Essential Facilities Doctrine

Mastercard argues that OV Loop has failed to plead a violation of the essential facilities doctrine because it has not sufficiently alleged that access to Mastercard tokens is essential. Mem. ISO Mot. to Dismiss 13 [Doc. No. 55].

The essential facilities doctrine "aims to prevent a firm with monopoly power from extending that power 'from one stage of production to another, and from one market into

16

another.'" Interface Grp., Inc. v. Massachusetts Port Auth., 816 F.2d 9, 12 (1st Cir. 1987) (quoting MCI Commc'ns Corp. v. Am. Tel. & Tel. Co., 708 F.2d 1081, 1132 (7th Cir. 1983)). "When a monopolist denies a competitor access to a facility it needs to compete, the denial is at least arguably 'unreasonable' or 'exclusionary' in the antitrust sense, and therefore unlawful." Id. The Supreme Court has neither rejected nor recognized the essential facilities doctrine, but it has stated that "the indispensable requirement for invoking the doctrine is the unavailability of access to the 'essential facilities'; where access exists, the doctrine serves no purpose." Trinko, 540 U.S. at 411.

OV Loop argues that "MDES is an essential facility for processing Mastercard mobile contactless payment transactions." Opp'n 20 [Doc. No. 67] (emphasis added). But OV Loop has not sufficiently alleged that MDES is an essential facility for competing in the First Relevant Market. The Ninth Circuit has explained that "a facility is only 'essential' where it is otherwise unavailable." Aerotec Int'l, Inc. v. Honeywell Int'l, Inc., 836 F.3d 1171, 1185 (9th Cir. 2016). And the Second Circuit has held that an essential facilities claim requires the plaintiff to show "more than inconvenience, or even some economic loss;" the plaintiff "must show that an alternative to the facility is not feasible." Twin Lab'ys, Inc. v. Weider Health & Fitness, 900 F.2d 566, 570 (2d Cir. 1990). Here, OV Loop alleges that it has a path to access Visa's tokenization service, Am. Compl. ¶ 163 [Doc. No. 48], that Visa issues more cards than Mastercard, id. ¶ 127, and that American Express and Discover provide tokenization services for the cards that they issue, id. ¶ 63 n.2.

OV Loop's inability to offer a mobile wallet platform that provides payment processing for Mastercard-branded cards may inhibit the growth of its platform. But OV Loop has not sufficiently alleged that MDES is "essential" to offering "mobile wallet contactless payments

17

network processing services on behalf of banks" where OV Loop alleges it has a path to access tokenization services for at least one a widely-used alternative. See Aerotec Int'l, 836 F.3d at 1185 (rejecting essential facilities claim where plaintiff could access parts market it claimed was "essential," including by purchasing parts from suppliers other than defendant); cf. Trinko, 540 U.S. at 407–08 ("Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities."). Consequently, OV Loop has not alleged that MDES is an "essential facility" such that Mastercard's refusal to certify OV Loop constitutes anticompetitive conduct under Section 2.

### B. *Attempted Monopolization*

OV Loop also alleges attempted monopolization claims based on a refusal to deal, Am. Compl. ¶¶ 220–226 [Doc. No 48], denial of access to an essential facility, id. ¶¶ 238–242, and a general attempted monopolization claim based on Mastercard's refusal to grant OV Loop MDES access, see id. ¶ 273. Mastercard argues that OV Loop's acknowledgement that Visa has a larger market share than Mastercard in the First Relevant Market defeats its attempted monopolization claim because it suggests that Mastercard's conduct does not create a dangerous probability that Mastercard would achieve monopoly power. See Mem. ISO Mot. to Dismiss 19 [Doc. No. 55].

Section 2 of the Sherman Act prohibits attempts to monopolize. 15 U.S.C. § 2. "The elements of attempted monopolization are '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" Diaz Aviation Corp. v. Airport Aviation Servs., Inc., 716 F.3d

256, 265 (1st Cir. 2013) (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993)). Predatory or anticompetitive conduct is conduct that "unfairly tends to destroy competition itself." See Spectrum Sports, 506 U.S. at 458.

Above, the court has explained that OV Loop has failed to allege that Mastercard has engaged in anticompetitive conduct in withholding OV Loop's certification to access MDES. Further, OV Loop has failed to allege a "dangerous probability" that Mastercard's denial will enable it to obtain monopoly power. OV Loop has failed to allege that Mastercard currently possesses monopoly power in large part because it has not alleged that Mastercard has a predominant share of the First Relevant Market. Where OV Loop has alleged that Visa-branded cards outnumber Mastercard-branded cards, Am. Compl. ¶ 127 [Doc. No. 48], it is not reasonable to infer that denying OV Loop the ability to process payments made with Mastercard-branded cards creates a dangerous probability that Mastercard will grow its share of that market and obtain monopoly power. This is particularly true where OV Loop alleges it has a path to access to Visa's tokenization service; if anything, Mastercard's market share would presumably decrease if OV Loop's platform can process payments with Visa's cards but not Mastercard's.

In sum, OV Loop has not sufficiently alleged that Mastercard's denial of access to MDES constitutes attempted monopolization under Section 2.

IV. Conclusion

For the foregoing reasons, Mastercard's Motion to Dismiss [Doc. No. 54] is GRANTED.

IT IS SO ORDERED.

May 7, 2025                              /s/Indira Talwani
                                                   United States District Judge